The Cascadia Project LLC
Case No. 09-20780-KAO

# Exhibit A

# DEBTOR-IN-POSSESSION FINANCING AGREEMENT

This Debtor-in-Possession Financing Agreement (the "Agreement") is made and entered into as of November 25, 2009, Seattle, United States time by and among **The Cascadia Project LLC** ("Cascadia"), and **Y. K. Chen** ("Lender"), by and through Tsuey-Fang N. Chen, his attorney-in-fact..

## RECITALS

A. **Indebtedness to Lender.**

   1. **Existing Indebtedness.** Cascadia is obligated to Lender pursuant to a promissory note dated October 15, 2009, in the original principal amount of $1,500,000 (as amended, the "Note"). As of the Petition Date, Cascadia had drawn $430,000 on the Note.

   2. **Existing Collateral.** Cascadia agrees and acknowledges that to secure its payment of all its obligations to Lender, Cascadia granted Lender an interest in and liens on Cascadia's 50 percent interest in Cascadia Resort Communities LLC ("Existing Collateral"), pursuant to a security agreement ("Existing Security Agreements"). Lender and Cascadia agree and acknowledge that the foregoing recital and the recital in paragraph A.1 above are binding only on Cascadia and not on any third party, including any trustee.

B. **Chapter 11 Bankruptcy Case.**

   1. **Filing.** Cascadia filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on October 15, 2009 (the "Petition Date"), commencing the Bankruptcy Case.

C. **New Revolving Facility.**

   1. **Need for New Revolving Facility.** Cascadia had been funding operations with unencumbered cash. Cascadia projects that such unencumbered cash will be depleted in the near future. Cascadia requires cash in order to maintain operations. Such operations include, but are not limited to operating Cascadia's office, maintaining Cascadia's property, working on issues pertaining to land use, zoning, and permitting (including timber harvesting and gravel mining operations), performing marketing, and negotiating with home builders, businesses, and equity investors. In order to ensure that Cascadia can continue operations and timely satisfy its expenses incurred after the Petition Date, Cascadia requires access to a source of funding.

   2. **No Other Source of Funding.** Cascadia has evaluated other sources to obtain financing similar to the New Revolving Facility and has made all reasonable efforts under the circumstances to secure financing on terms better than the New Revolving Facility. Cascadia is currently unable to obtain a facility similar to the New Revolving Facility on an unsecured basis (even with the priority afforded under Section 503(b)(1) of the Bankruptcy Code). The interest provided herein to secure the New Revolving Facility is the existing interest that secures that facility. No party other than Lender has an interest in the Existing Collateral.

3. **Use Consistent With Code.** Cascadia does not intend to use advances from the New Revolving Facility for any purpose not permitted by the Bankruptcy Code. This Agreement does not contain any provision set forth in part A to Appendix A, Guidelines for Cash Collateral and Financing Stipulations, of the Local Bankruptcy Rules.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties agree as follows:

## ARTICLE 1
## INCORPORATION OF RECITALS, DEFINITIONS, AND EXHIBITS

1.1   **Recitals.** The foregoing recitals are incorporated into this Agreement by this reference.

1.2   **Definitions.** Except as otherwise defined herein or as the context requires otherwise, capitalized terms used herein have the meanings assigned to them in Appendix A hereto.

## ARTICLE 2
## CONDITIONS PRECEDENT

Before Lender will be bound to the terms of this Agreement, the following conditions must have been fulfilled to Lender's satisfaction:

(a)   Cascadia must have filed a motion for authorization to enter into this Agreement and carry out the transactions described herein and must have provided notice of a hearing on the motion in accordance with Federal Rule of Bankruptcy Procedure 4001(d), local bankruptcy rules, and any applicable orders of the Bankruptcy Court.

(b)   A Bankruptcy Court order approving this Agreement, together with separate supporting findings of fact and conclusions of law both in such forms as reasonably required by Lender, must have been entered (the "Approval Order").

(c)   Cascadia must have executed and delivered to Lender a security agreement, in such form as required by Lender (the "New Security Agreement"), granting Lender an interest in the Existing Collateral in accordance with this Agreement.

(d)   Cascadia must have executed and delivered to Lender the New Revolving Note.

(e)   There exists no Default under this Agreement.

## ARTICLE 3
## LENDING

3.1   **Revolving Loan.** Subject to the terms and conditions of this Agreement and the New Revolving Note, Lender shall make a revolving credit facility available to Cascadia (the "New Revolving Facility"). The maximum availability under the New Revolving Facility is

$1,500,000 less the amount advanced under the Note. Availability under the New Revolving Facility is also limited by the Budget and the terms of this Agreement. Cascadia shall use funds borrowed pursuant to the New Revolving Facility only (a) for general corporate purposes in the ordinary course of Cascadia's business or for payments to Lender, (b) in compliance with the Bankruptcy Code, (c) in compliance with the terms and conditions of this Agreement, and (d) in conformance with the Approval Order and the Budget.

   3.2 **The New Revolving Note.** Prior to or contemporaneously with the execution of this Agreement, Cascadia shall execute and deliver to Lender a promissory note in the form of the Note (the "New Revolving Note") evidencing Cascadia's repayment requirements for the New Revolving Facility. Interest will accrue on the obligations evidenced by the New Revolving Note at a nondefault rate of 12%.

   3.3 **Advances Under Revolving Loan.** Upon request of Cascadia, on a basis of no more than twice a week, and if no Event of Default then exists and to the extent that Cascadia is entitled to borrow from Lender, Lender shall advance the funds requested, or so much thereof as Cascadia is entitled to under the New Revolving Facility, to the Operating Account for the purpose of paying expenses and payroll in accordance with the Budget, and the fees and costs described in paragraph 6.3 of this Agreement. Lender will be under no obligation to advance funds into the Operating Account unless (a) Cascadia is in compliance with this Agreement, (b) Cascadia has provided Lender with a certificate in the form acceptable to Lender showing, among other things, that Cascadia is in compliance with the terms of this Agreement, and (c) the amount to be funded is in accordance with the Budget.

     (a) All advances under this Agreement are at Lender's sole discretion.

   3.4 **Draws and Transfers in General.** Cascadia may not obtain an advance on the New Revolving Facility unless the item is in conformance with the Budget, the Bankruptcy Code, this Agreement, and the Approval Order.

   3.5 **Budget.** Cascadia has prepared and presented to Lender the Budget, cash-flow projections of Cascadia's anticipated revenues and expenditures with respect to Cascadia's operations for the period from December 1, 2009, through March 31, 2010. A copy of the Budget is attached to this Agreement as <u>Exhibit 1</u>. Cascadia hereby represents and warrants that the projected revenues and expenditures specified in the Budget constitute Cascadia's best estimate of the revenues that will be generated by Cascadia's operations during the period covered by the Budget and the expenses that will be incurred by Cascadia in connection with Cascadia's operations during the period covered by the Budget. At any time, Cascadia may propose a revised budget, which may become the Budget only if consented to by Lender and the Committee. Cascadia may obtain transfers from the New Revolving Facility into the Operating Account in the aggregate amount of 100 percent of the amount of Total Cash Outflows projected in the Budget (together with any applicable Carryover as defined in paragraph 3.6). In any calendar week, Cascadia may not use more than 110 percent of the amount projected in the Budget for any category of expenses specified in the Budget that is greater than $5,000 for the week in question, or more than 120 percent of the amount projected in the Budget for any category of expenses specified in the Budget (together with any applicable Carryover) that is less than $5,000 for the week in question, without Lender's prior written consent.

- 3 -

3.6     **Possible Expense Carryover.**  Subject to the limitation specified in the following sentence, if during any calendar week following the date of this Agreement the aggregate amount of expenses actually paid for in a week is less than the aggregate amount of Total Cash Outflows projected in the Budget for the week in question (which difference between the budgeted amount and the actual use during the two-week period in question is referred to in this Agreement as a "Carryover"), then during the following calendar weeks the amount of Total Cash Outflows set forth in the Budget is to be deemed to include the Carryover.  Any Carryover, however, will be allocated only to the corresponding line item expense in the Budget.  In other words, Cascadia will not be able to use the unpaid portion of any projected expenses in one line item to increase the availability of expenses under another line item.

3.7     **Termination of New Revolving Financing.**

(a)     Time of Termination.  Cascadia's authority to obtain advances under the New Revolving Note will expire at the earliest of the following (the earliest date being the "Termination Date"):

(i)     The occurrence of an Event of Default; or

(ii)    11:59 p.m. on March 31, 2010 (that date being the "Budget Termination Date").

(b)     Extension of Budget Termination Date.  Lender may consent to Cascadia's use of the New Revolving Facility beyond the Budget Termination Date, in which case all provisions of this Agreement will remain in full force and effect, except that the date set forth in paragraph 3.7(a)(ii) hereof will be deemed modified accordingly, and the revised budget agreed to by Lender, Cascadia, and the Committee for expenses during that additional period will become the "Budget" as used in this Agreement.

3.8     **Maturity of New Revolving Facility.**  The New Revolving Facility will terminate and the obligations of Cascadia under the New Revolving Facility and the New Revolving Note will be immediately due and payable upon the Termination Date (including March 31, 2010, unless Lender specifically, in writing, extends the period of the New Revolving Facility before that date).

3.9     **Use of New Revolving Facility After Confirmation of a Plan.**  If a Plan acceptable to Lender, in its discretion, is confirmed before the Termination Date, the terms of such Plan will supersede and replace this Agreement and the Approval Order, and the terms of such Plan will govern the repayment of the New Revolving Note.  If a Plan is confirmed that is not acceptable to Lender, Cascadia may no longer obtain advances under the New Revolving Note and all amounts owing under such note shall be immediately due and payable.

# ARTICLE 4
# ADEQUATE PROTECTION

4.1     **Postpetition Security Interest.**

(a)     Grant of Postpetition Security Interest. As partial adequate protection for the use of the New Revolving Facility provided by this Agreement, Lender is hereby granted a security interest in and lien on the Existing Collateral.

(b)     Validity and Priority. The security interests and liens granted above have a first-priority position and, upon satisfaction of the conditions precedent described in Article 2, are valid and enforceable. The granting of the foregoing security interests and liens are in addition to the security interests and liens in favor of Lender in the Existing Collateral. Cascadia may not create or grant an interest senior to Lender's interest in the Existing Collateral without Lender's consent or Bankruptcy Court order, except, however, that Lender hereby subordinates his interest in the Existing Collateral up to the amount of $500,000 to pay the fees and costs of professionals as allowed by paragraph 6.3 of this Agreement.

(c)     Documentation. The Postpetition Security Interest and Lender's interest in the Existing Collateral are governed by all terms of the Existing Security Agreement, except to the extent that those terms are inconsistent with the provisions hereof, the Bankruptcy Code, or the Federal Rules of Bankruptcy Procedure. The security interests and liens granted in this Agreement are to be choate, attached, and perfected automatically by entry of an order approving this Agreement. In any event, upon request of Lender, Cascadia shall execute further security agreements and any other documents, in the forms satisfactory to Lender, as are reasonably necessary to create, evidence, and perfect Lender's interest in the Existing Collateral to secure the obligations under the New Revolving Note. Cascadia hereby authorizes Lender to file any financing statements deemed to be necessary by Lender to perfect the security interest provided by this Agreement. The parties agree that the automatic stay of Bankruptcy Code § 362(a) may be modified by entry of the Authority Order to permit Lender to do all acts permitted or required by this paragraph 4.1(c).

(d)     No Waiver or Admission. Nothing contained in this Agreement constitutes or causes a waiver of Lender's rights or the priority or Lender's liens and security interests in the Existing Collateral, or an admission that the protection provided by this Agreement is adequate to protect the interests of Lender. To the extent of the diminution, if any, of the value of the Existing Collateral as of the Petition Date, Lender is hereby granted all its rights pursuant to Bankruptcy Code § 507(b). Nothing in this Agreement or the Order constitutes an admission by Lender regarding the value of Lender's secured claim. Furthermore, nothing in this Agreement binds Lender with respect to or constitutes an agreement by Lender concerning treatment of its claim under any Plan that may be proposed in this case.

# ARTICLE 5
# COVENANTS

5.1     **General Affirmative Covenants.** Cascadia covenants that it will:

(a)     Maintain and preserve its corporate existence.

(b)     Keep its books of account in accordance with generally accepted accounting principles, consistently applied.

(c)     Deliver to Lender copies of all reports filed by Cascadia with any governmental agency.

(d)     With reasonable promptness, provide such other information respecting the business, operations, and financial condition of Cascadia or its affiliates as Lender may from time to time reasonably request.

(e)     Maintain all material licenses, permits, and all related or other agreements necessary for Cascadia to operate its business, as they may now exist or be modified or expanded.

(f)     At all times comply with any and all material regulations, rules, or requirements of any federal agency or department and of any state, local, or municipal government, agency, or department that may at any time have jurisdiction or power to regulate, license, or grant permits in respect of the facilities or activities of Cascadia, whether those regulations, rules, or requirements presently exist or are modified, promulgated, or implemented after the date hereof.

(g)     Duly pay and discharge all lawful claims that arise following the Petition Date, whether for labor, materials, rentals, or anything else, that might or could, if unpaid, become a lien or charge on Cascadia's property, unless and only to the extent that the validity thereof, after written notice thereof has been given to Lender, is being contested in good faith and by appropriate proceedings. If any charge is being contested by Cascadia as allowed above, Cascadia shall establish adequate reserves against possible liability in respect thereto.

(h)     Timely pay all its employees, in accordance with its agreements with the employees and all applicable law, for services rendered after the Petition Date, and pay all payroll and other taxes imposed on it with respect to its employees or otherwise that accrue after the Petition Date.

(i)     Immediately advise Lender in writing of any Hazardous Materials Claim.

(j)     At its sole cost and expense, keep and maintain its properties and each portion thereof in compliance with, and not cause or permit its properties or any portion thereof to be in violation of, any Hazardous Materials Laws.

(k)     Promptly give written notice to Lender of any of the following:

    (i)     Any citation, order to show cause, or other legal process or order that could have a material adverse effect on it, directing it to become a party to or to appear at any proceeding or hearing by or before any governmental agency or instrumentality or any municipality or other agency or instrumentality that has granted to it a license, certificate of compliance, or permit, and include with

      the notice a copy of the citation, order to show cause, or other legal process or order.

  (ii) Any (1) refusal or failure by any governmental agency or instrumentality to renew or extend any material license, certificate of compliance, or permit, or (2) proposed or actual revocation, termination, or modification (whether favorable or adverse) thereof, or (3) dispute or other action with respect thereto, or (4) denial or threatened denial or revocation or modification by any governmental agency or instrumentality of any material authorization required by law, or (5) notice from any governmental agency or instrumentality of the imposition of any material fines, or penalties, or forfeitures, or (6) threats or notice with respect to any of the foregoing or with respect to any proceeding or hearing that might result in any of the foregoing.

  (iii) Any dispute concerning, or any threatened nonrenewal or modification of, any material lease for real or personal property to which it is a party.

  (iv) Any postpetition actions, proceedings, or claims of which it may have notice, that may be commenced or asserted against it in which the amount involved is $10,000 or more, and that are not fully covered by insurance or that, if not solely a claim for monetary damages, could, if adversely determined, have a material adverse effect on it.

  (l) Promptly notify Lender if Cascadia becomes aware of a Default or Event of Default hereunder.

  (m) Within ten days of request by Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments, agreements, and documents and do or cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purpose of this Agreement.

  5.2 **Bankruptcy Code Compliance.** Cascadia shall comply with all rules or requirements contained in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules of the Bankruptcy Court, and Cascadia shall comply with all orders of the Bankruptcy Court.

  5.3 **Reporting Requirements.**

  (a) <u>Weekly Financial Report</u>. On December 15, 2009, and at or before 12 noon of every other Wednesday thereafter, Cascadia shall provide to Lender a report containing the following information:

    (i) Cash income for the prior two weeks and for the period since the Petition Date;

    (ii) Cash expenditures by Budget line items for the prior two weeks and for the period since the Petition Date;

    (iii) A comparison of actual weekly and cumulative income and expenditures by line item to budgeted weekly cumulative income and expenditures by line item as set forth in the Budget; and

    (iv) A copy of its check registers, showing all checks written by Cascadia during the week ending on the preceding Friday, with each check listed in the register identified by check number, date, payee, amount, and Budget category.

  (b) <u>Monthly Financial Reports</u>. On December 15, 2009, and continuing thereafter, on or before the 15th day of each month, Cascadia shall deliver to Lender the following, all in form as reasonably required by Lender: (i) accounts payable for payables arising after the Petition Date as of the last day of the prior month; (ii) a balance sheet as of the last day of the prior month; and (iii) an operating statement for the prior month.

  (c) <u>Default</u>. For the purposes of determining whether an Event of Default has occurred by reason of a breach or Default under this paragraph 5.3 ("Reporting Requirements"), an Event of Default under the Reporting Requirements will not be deemed to have occurred, provided that (i) the person or entity charged with responsibility for the matter in question has delivered to Lender information that the person or entity in good faith believes complies with the Reporting Requirements, and (ii) within fourteen days' written notice from Lender of noncompliance with the Reporting Requirements, the person or entity provides Lender with full, complete, and accurate information that fulfills the Reporting Requirements.

  5.4 **Inspection and Appraisal.** Lender may inspect and copy any of Cascadia's books and records and inspect any of Cascadia's physical assets. Any such inspection or appraisal is to take place during ordinary business hours and may not unduly interfere with the operation of Cascadia's business. Lender shall give Cascadia reasonable notice before conducting such an inspection or appraisal, provided that the notice is not less than 72 hours. Lender's rights hereunder are in addition to all of Lender's rights to inspect and appraise its Collateral under its security agreements with Cascadia and otherwise.

  5.5 **Meetings.** Upon written request of Lender, Cascadia shall meet with Lender on reasonable notice, at reasonable times, and at reasonable intervals to inform Lender of the status of the Bankruptcy Case.

  5.6 **Negative Covenants.** Cascadia covenants that, so long as this Agreement is in effect, and until Cascadia's Indebtedness to Lender is paid or satisfied in full, it shall not without the prior written consent of Lender:

    (a) Obtain credit other than with vendors in the ordinary course of business.

(b) Employ any Person when it will be unable to pay the Person the required compensation or any taxes with respect thereto.

(c) Lend money, make credit available (other than in the ordinary course of business to customers), or lend property or the use thereof to any Person, sell all or a substantial part of its assets or properties, or guarantee, assume, endorse, or otherwise become responsible for the Indebtedness, performance, or obligations of any Person, or agree to do any of the foregoing, except the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

(d) Enter into any business that is substantially different from and/or not connected with the businesses in which Cascadia is presently engaged, or make any substantial change in the nature of its businesses or operations.

(e) Change the chief executive office of Cascadia or the state of its organization without (i) prior written notice to Lender, and (ii) the execution, delivery, and filing (and payment of filing fees and taxes) of all such documents as may be necessary or advisable in the opinion of Lender to continue to perfect and protect the liens and security interests in the Existing Collateral.

(f) Enter into any agreement (other than employment agreements) with any Person that would confer upon the Person the right or authority to control or direct a major portion of the business or assets of Cascadia.

(g) Permit its properties or any portion thereof to be a site for the storage, use, generation, manufacture, disposal, or transportation of Hazardous Materials.

(h) Permit any Hazardous Materials that were owned or generated by Cascadia to be disposed of off their properties other than in properly licensed disposal sites.

## ARTICLE 6
## EVENTS OF DEFAULT; REMEDIES

6.1 **Events of Default.** The occurrence of any one or more of the following constitutes an "Event of Default" under this Agreement:

(a) Entry of an order staying any term or condition of this Agreement or transactions described herein.

(b) Custody or control of any substantial part of the property of Cascadia is assumed by any governmental agency or authority or any court of competent jurisdiction at the insistence of any governmental agency or authority, or any governmental regulatory agency or authority takes any final action that would have a material adverse effect on Cascadia.

(c) Any governmental agency or instrumentality refuses or fails to issue, renew, or extend any lease, license, contract, certificate of compliance, or permit with respect to the operation of the business of Cascadia, or any governmental agency or instrumentality denies,

forfeits, or revokes any license, permit, or authorization required by law, when the refusal, failure, denial, forfeiture, or revocation could have a material adverse effect on Cascadia.

(d)     Any event occurs that specifically affects Cascadia and that has a material adverse effect on the business or financial condition of Cascadia, or that materially increases Lender's risk or materially impairs the Collateral.

(e)     Cascadia's authority to borrow from Lender terminates or expires.

(f)     The Bankruptcy Court announces from the bench or enters any order or judgment holding any material provision of this Agreement invalid or unenforceable.

(g)     The Bankruptcy Court announces from the bench or enters any order dismissing the Bankruptcy Case or converting that case to a Chapter 7 case or Cascadia files a motion to convert that case to a Chapter 7 case.

(h)     The Bankruptcy Court enters an order appointing a trustee or examiner.

(i)     Cascadia fails to make when due any payment required hereunder.

(j)     The occurrence of an effective date under a Plan, except for a Plan consented to by Lender in which case the provisions of such Plan will supersede the terms of this Agreement.

(k)     There occurs any breach of or default under any term, covenant, agreement, condition, provision, representation, or warranty contained in this Agreement, not referred to in this Article 6, and the breach is not cured within 10 days of written notice from Lender thereof or within a period of time, not to exceed 30 days, reasonably necessary to diligently pursue the cure of the breach if a cure is not possible in 10 days.

6.2     **Remedies Upon Default.**

Upon the occurrence of any Event of Default, Lender may cease to provide any further advances under the New Revolving Facility without notice or hearing, and Cascadia's authority to use the New Revolving Facility will immediately terminate.

6.3     **Payments of Professionals.** The Budget contains a line item for payment of professional fees. It is acknowledged by Cascadia and Lender that the amount budgeted for professionals may not be accurate and the actually amount owing to professionals may be substantially greater than that set forth in the Budget. Nevertheless, professionals for Cascadia and the Committee are entitled to payment from the New Revolving Facility only on the following terms:

(a)     The Bankruptcy Court has entered an order approving the fees and costs as reasonable under applicable sections of the Bankruptcy Code or an order approving a procedure to authorize the amount of fees and costs on an interim basis; and

      (b)     None of the fees requested are for investigation or prosecution of claims or demands against Lender or of Lender's interest in the Existing Collateral.

## ARTICLE 7
## MISCELLANEOUS

      7.1     **Time of the Essence.** Time is of the essence of this Agreement. In particular, but without limitation, Cascadia shall execute security agreements and any other documents as reasonably deemed necessary or appropriate by Lender, with respect to the security interest granted by this Agreement.

      7.2     **Notices.** Any notices required or permitted to be given under the terms of this Agreement or by law must be in writing and may be given by facsimile or e-mail at the facsimile numbers or e-mail addresses provided below, by personal delivery, or by certified mail, directed to the parties at the addresses at the head of this Agreement (or such other address as any party may designate in writing before the time of the giving of such notice), or in any other manner authorized by law. Any notice given will be effective when actually received or, if given by certified mail, then 48 hours after the deposit of the notice in the United States mail with postage prepaid.

Facsimile numbers and e-mail addresses for notices:

To:    Cascadia    Patrick Kuo  
                                  Fax: 425.646.0242  
                                  E-mail: pkuo@cascadiacorp.com

                                  Geoff Groshong  
                                  Fax: 206.622.7485  
                                  E-mail: geoff.groshong@millernash.com

To:    Lender      Y.K. Chen  
                                  c/o Tsuey-Fang N. Chen, his attorney in fact  
                                  Fax: (425.646.0242  
                                  E-mail: pkuo@cascadiacorp.com

      7.3     **Waiver.** No waiver of any right arising out of a breach of any covenant, term, or condition of this Agreement is to be a waiver of any right arising out of any other or subsequent breach of the same or any other covenant, term, or condition or a waiver of the covenant, term, or condition itself. Any party benefited by a provision of this Agreement may waive the provision without future notice or order in a writing signed by the waiving party. Lender may decline to exercise any or all of the rights or remedies available to it hereunder or otherwise. A decision by Lender not to exercise any such right or remedy does not constitute a basis for any party to assert that Lender has waived in any way the right to insist on strict compliance by Cascadia with the terms of this Agreement.

7.4     **Captions.**  The captions hereof are inserted only for convenience and are not part of this Agreement or a limitation on the scope of the particular paragraph to which each refers.

7.5     **Legal Proceedings.**  If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this Agreement (specifically including, but not limited to, actions in state or federal courts and proceedings in cases under the Bankruptcy Code), the prevailing party in the proceeding will be entitled to recover reasonable attorney fees in the proceeding, or any appeal thereof, to be set by the court or other tribunal.  Attorney fees include an amount estimated by the court as the reasonable costs and fees to be incurred by the prevailing party in collecting any monetary judgment or award or otherwise enforcing the order, judgment, or decree entered in the legal proceeding.

7.6     **Severability.**  If any provision of this Agreement is held to be invalid or unenforceable, all other provisions will nevertheless continue in full force and effect.

7.7     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, effective as of the date first written above.

**THE CASCADIA PROJECT LLC**

By _____[signature]_____          _____[signature]_____
~~Patrick Kuo~~ Steven Ahans CFO       Y. K. Chen
~~Managing Member~~                     by and through
                                        Tsuey-Fang N. Chen, his attorney in fact

## APPENDIX A

### DEFINITIONS

The following terms used but not defined in this Agreement shall have the meanings set forth below:

"Agreement" means this debtor-in-possession financing agreement.

"Approval Order" has the meaning set forth in Article 2 hereof.

"Bankruptcy Case" means Cascadia's Chapter 11 bankruptcy case pending in the Bankruptcy Court under Case No. 09-20780-KAO.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Washington at Seattle.

"Budget" means the cash-basis income and expense budget prepared by Cascadia for the period from December 1, 2009, attached hereto as <u>Exhibit 1</u>. "Budget" also means the budget for the period beyond March 31, 2010, which has been approved by Lender and the Committee.

"Budget Termination Date" has the meaning set forth in paragraph 3.7(a)(ii) in this Agreement.

"Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"Default" means any condition or event that constitutes an Event of Default, or that with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Event of Default" means any of the events described in paragraph 6.1 hereof.

"Existing Collateral" means Cascadia's 50 percent interest in Cascadia Resort Communities LLC.

"Existing Loan Documents" means the Note and the Existing Security Agreement and all other documents related to and executed or delivered in connection with any of the foregoing.

"Existing Security Agreement" means the agreement that grants Lender an interest in property to secure any or all of the Indebtedness of Cascadia to Lender that was executed and delivered to Lender before the Petition Date.

"Hazardous Materials" means any oil or petrochemical products, PCBs, asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic

substances, or related materials, including without limitation any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Hazardous Materials Claims" means (a) any and all enforcement, cleanup, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any applicable Hazardous Materials Laws; and (b) any and all claims made or threatened by any third party against Cascadia or the property of either of them relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Materials.

"Hazardous Materials Laws" means all federal, state, or local laws, ordinances, regulations, orders, and directives pertaining to Hazardous Materials.

"Indebtedness" means any and all obligations of Cascadia to Lender, including but not limited to the obligations described in the Existing Loan Documents, the New Revolving Note, this Agreement, and any and all other obligations of Cascadia to Lender that, in accordance with generally accepted accounting principles, would be included in determining total liabilities as shown on the liabilities side of the balance sheet.

"Loan Documents" means the Existing Loan Documents, this Agreement, the New Revolving Note, the New Security Agreement, and all other agreements, instruments, and documents arising out of or relating to Cascadia's Indebtedness to Lender, including without limitation all such agreements, instruments, and documents previously obtained by Lender from Cascadia granting Lender a security interest in the Existing Collateral, as well as all renewals and modifications thereof.

"New Revolving Facility" has the meaning set forth in paragraph 3.1 of this Agreement.

"New Revolving Note" has the meaning set forth in paragraph 3.2 of this Agreement.

"Note" means the October 15, 2009, promissory note from Cascadia to Lender in the original amount of $1,500,000 as amended and modified.

"Operating Account" means Account No. ***2367 at The Commerce Bank of Washington, which has been opened for Cascadia for payment of its general postpetition operating expenses.

"Person" means any individual, partnership, joint venture, firm, corporation, association, trust, or other enterprise, or any government or political subdivision or agency, department, or instrumentality thereof.

"Petition Date" means 6:23 pm October 15, 2009.

- 3 -

"Plan" means any plan of reorganization or liquidation submitted under Subchapter II of Chapter 11 of the Bankruptcy Code in the Bankruptcy Case.

"Reporting Requirements" means the requirements of paragraph 5.3(c) hereof.

*[The rest of this page intentionally left blank.]*

## Exhibit 1

Budget